## TELLURIDE POWER CO. v. WILLIAMS.
### No. 3737.

United States Court of Appeals
Tenth Circuit.
Feb. 4, 1949.

---

[4] Note, Harv.Law Review, Vol. 62, No. 1, November, 1948, p. 136; 28 U.S.C.A. § 2254; Canada v. Jones, 8 Cir., 170 F. 2d 606.

W. Q. Van Cott, of Salt Lake City, Utah (H. R. Waldo, of Salt Lake City, Utah, on the brief), for appellant.

Edward F. Richards, of Salt Lake City, Utah (Harley W. Gustin, of Salt Lake City, Utah, on the brief), for appellee.

Before PHILLIPS, Chief Judge, HUXMAN and MURRAH, Circuit Judges.

HUXMAN, Circuit Judge.

This was an action by James D. Williams[1] against the Telluride Power Company[2] to recover damages caused to Williams' mine by flooding due to the alleged negligent acts of Telluride. This is the second appeal to this court by Telluride. See 164 F.2d 685. The facts out of which this controversy arose are clearly stated in our former opinion and will be restated only insofar as necessary to consider what occurred at the second trial. We reversed the judgment entered on the verdict in favor of Williams in the first trial on the ground that the trial court erred in failing to instruct the jury that Williams was limited to the damages, if any, which occurred after the time Telluride should have made the change over in transformers, after being notified by Williams to change back to the old transformers. On the second trial the jury was properly instructed, and, in answer to interrogatories, specifically found that $9716.00 of Williams' claim for $12,642.00 for loss of ore from the flooding of the mine was directly attributable to the unreasonable delay in making the change over. This item, together with the other specific items of damages, made up the verdict of $11,076.00. The trial court granted a remittitur of one item not involved here and entered judgment for Williams for $10,026.59.

The change from the original Converse transformers to the Allis Chalmers transformers was made about 4 P.M. on Saturday, July 7, 1945. When the current was turned on, the electric pump refused to operate. Telluride was notified to change back to the original Converse transformers between 9 A.M. and 10 A.M. on Monday, July 9, but did not make the change back until the following Thursday, July 12, at 11:15 A.M. When the current was thereafter turned on the pump immediately began to operate. Under the law of the case as laid down in the former appeal, Telluride became liable for any damage to the mine which occurred from approximately noon Monday, July 9, to the time when the change back was made on July 12.

The jury returned a verdict for plaintiff for $11,076.00. The items of damages and the amounts of each were stated to be as follows: Rehabilitation of the mine, $250.00; dewatering the mine, $1110.00; loss of ore, $9716.00. Judgment was entered for $11,076.00. On a hearing on Telluride's motion for a new trial, the judgment was modified by reducing the item for dewatering the mine from $1110.00 to $60.59, and the judgment was accordingly reduced to $10,026.59.

Telluride contends that the evidence entirely failed to show what damages were caused before and what damages were caused after the change back to the Converse transformers should have been made, and therefore, no judgment could be entered against it.

Williams, the owner of the mine, testified that Winze No. 3 was 30 vertical feet below the 500 foot level in the mine; that Winze No. 2 was 55 vertical feet below the level; and that Winze No. 4 was 75 vertical feet below that level; and that they were producing ore from Winze Nos. 2, 3, and 4. There was testimony that it was the practice to shut off the water pump during the eight hour working period and that during such time the water would rise to within 20 or 30 feet of the 500 foot level; that at one time on a previous occasion the water pump was off for 36 hours, during which time there was a partial flooding of the mine; that no damage resulted to the mine from these floodings because the water was not permitted to stand for any period of time but was promptly pumped out.

There was also evidence that the hanging wall consisted of decomposed shale and limestone and that permitting the water to remain in the mine would cause it to percolate through all cracks and fissures in

---

[1] Herein called Williams.  [2] Herein called Telluride.

the hanging wall and thoroughly soak it and loosen it and that if that happened the damage was done irrevocably.

O. C. Koch, Division Superintendent of the Power Company, testified that he went into the mine on Monday morning, July 9, and saw men working in the mine and saw them bring ore up to the hoist in cars, and that the hoist was on the 500 foot level. This testimony would warrant the jury in believing that the mine had not completely flooded at the time Telluride was required to make the change over. But even if the jury was of the view that the mine was completely flooded by noon July 9, under the evidence it still could have found that most of the damage to the ore body was caused by thereafter permitting the water to remain and thus permeate, saturate and loosen the structure. The jury was therefore warranted in finding that the damage, in part, was caused by the negligent delay on Telluride's part in changing back to the Converse transformers after it had been notified to do so.

■ Damages are not recoverable unless they are clearly ascertainable both in their nature and origin, and unless it is also so established that they are the natural and proximate consequence of the breach and are not contingent or speculative.[3] But when liability has once been established, recovery will not be denied if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result may be only proximate.[4] Not only is the conclusion warranted that the substantial portion of the damage was caused by negligently permitting the water to remain in the mine, but also it would, under the evidence, be difficult to conclude otherwise. The jury did apportion the damage to the ore body. Williams' evidence was that the value of the ore destroyed was $12,642.00, whereas the jury charged Telluride with liability for such loss only to the extent of $9,716.00.

■ As pointed out, Koch testified that he was at the 500 foot level on Monday, July 9, and saw Williams' employees working at that level. Such workmen were not produced as witnesses at the trial. Telluride argues that the failure to produce these witnesses requires the presumption that their evidence was adverse to Williams' contention and that the presumption therefore is that no men were working at the 500 foot level at that time. But even if such presumption is entertained, it does not require a different result. The jury was not bound by the presumption because here there was direct evidence that even if the mine was completely flooded at that time, the damage to the ore resulted from permitting the water to stand a long time and thus permeate and loosen the structure. Keeping in mind that it was not the flooding of the mine per se which caused the damage, then the actual water level at the time it became Telluride's duty to make the change over in transformers is not decisive of the issue of damages.

■ Neither does it follow that the jury disregarded the instruction of the court that Telluride was liable for only that damage which occurred after it was duty bound to make the change over because the jury permitted a recovery of the full amount of $250.00 that it cost to rehabilitate the mine. The jury was warranted in finding that even if there was water in the mine before Telluride became liable, the water which entered the mine thereafter was sufficient to make the cost of rehabilitating the mine to the extent of $250.00 necessary. That the jury had clearly in mind the distinction between damage that occurred before Telluride became liable, and damage occurring thereafter is evidenced by the fact that it did not charge Telluride with liability for the full damage resulting from flooding of the mine.

■ Telluride further contends that the jury disregarded the instructions of the court as to Williams' duty to mitigate the damage by recovering such ore as could thereafter be mined at a profit. The evidence on this question is in conflict. Lillie and Cramer, two engineering experts, did

---

[3] 15 A.J. 413–414; 25 C.J.S., Damages, § 27, page 493.

[4] 15 A.J. 415; 25 C.J.S., Damages, § 28, pages 493–496; Story Parchment Co. v. Paterson Parchment Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544; Bigelow v. R. K. O. Radio Pictures, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652.

testify that in their opinion some ore could be mined at a profit. Cramer, on further examination testified that whether such ore could be mined profitably depended upon the extent of the caving, and that the cost of timbering, dewatering, cleaning and other elements could consume all the profits. He testified that he had not made an inspection of the mine and could not tell the condition of the mine as to such matters. Williams, on the other hand, testified positively that the ore body could not under any circumstances be mined at a profit. Under this evidence, it was a question of fact for the jury's determination whether Williams could mitigate the damage by thereafter attempting to mine any of the ore, and we cannot say, as a matter of law, that it erred in its conclusion in that respect.

Affirmed.